FILED

2023 Feb-24  PM 02:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

PFE/JBW/DBL: March 2023
GJ # 24

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **JOHN ALAN ROBSON** | ) |

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

### THE DEFENDANT AND RELATED INDIVIDUALS AND ENTITIES

1.    **JOHN ALAN ROBSON** was a marketer. **ROBSON** owned Infiniti Medical, LLC, through which **ROBSON** marketed health care products and services, including prescription drugs from specialty pharmacies, durable medical equipment (DME), and electro-diagnostic testing. **ROBSON** was paid fees for prescriptions issued, DME ordered, and electro-diagnostic tests ordered by providers with whom **ROBSON** was associated.

2.    James Ray owned Integrity Medical, LLC, through which Ray marketed health care products and services, including prescription drugs from specialty pharmacies, durable medical equipment (DME), and electro-diagnostic

testing. Ray was paid fees for prescriptions issued, DME ordered, and electro-diagnostic tests ordered by providers with whom Ray was associated.

3.     Brian Bowman owned OrthoPlus, LLC, through which Bowman marketed health care products and services, including prescription drugs from specialty pharmacies, durable medical equipment (DME), and electro-diagnostic testing. Bowman was paid fees for prescriptions issued, DME ordered, and electro-diagnostic tests ordered by providers with whom Bowman was associated.

4.     John Hornbuckle was President and CEO of QBR, LLC (QBR), a company that provided electro-diagnostic testing. John Hornbuckle paid **ROBSON**, Ray, Bowman, and others to generate patient referrals to QBR for electro-diagnostic testing that would be billed to and paid by insurers.

5.     Dr. Eric Beck resided in Huntsville, Alabama. Dr. Beck owned and operated Valley Center for Nerve Studies and Rehabilitation (Valley Center) and billed insurers for electro-diagnostic testing performed by QBR technicians.

6.     Watson Rx Solutions, Inc. (Watson Rx) was a specialty pharmacy located in Florence, Alabama. Watson Rx paid **ROBSON**, Ray, Bowman, and others to generate specialty drug prescriptions from doctors that would be billed to and paid by insurers.

7.     Etowah Pain was a pain clinic in Rainbow City, Alabama. **ROBSON** marketed prescriptions, electro-diagnostic testing, and other ancillary services to Etowah Pain.

8.     Practice 2 was a pain clinic in Trussville, Alabama. **ROBSON** marketed prescriptions, electro-diagnostic testing, and other ancillary services to Practice 2.

9.     Hornbuckle paid Etowah Pain and Practice 2, through QBR, to refer patients to QBR for electro-diagnostic testing. Hornbuckle paid **ROBSON** a fee for each electro-diagnostic test ordered from QBR by Etowah Pain and Practice 2.

10.     Watson Rx paid **ROBSON** fees for the specialty drug prescriptions that were issued by Etowah Pain and Practice 2, sent to Watson Rx, and reimbursed by insurance.

### QBR AND ELECTRO-DIAGNOSTIC TESTING

11.     QBR was an Alabama limited liability company with its principal place of business in Huntsville, Alabama. It did business under the name Diagnostic Referral Community. QBR was in the business of, among other things, conducting electro-diagnostic testing, including nerve conduction velocity tests (NCV tests) and sensory evoked potential tests (SEP tests).

12.     An NCV test, also called a nerve conduction study, measures how fast an electrical impulse moves through a patient's nerve and is used to identify nerve

damage. An NCV test is performed by running an electrical impulse through the nerve being tested.

13.    An SEP test measures electrical activity in the brain in response to stimulation of sight, sound, or touch.

14.    QBR employed technicians to perform NCV and SEP tests on patients referred to QBR by physicians, and QBR provided the testing equipment for those tests. QBR technicians went to the referring physician office to perform testing on patients there. In exchange for referring patients to QBR, QBR paid the referring physician or the referring physician's practice a fee for each patient referred for testing that was ultimately reimbursed by insurance.

15.    QBR sent the NCV and SEP test results to Valley Center, which was operated by Dr. Beck. After tests were interpreted, a separate billing company, owned by Dr. Beck, billed each patient's insurance for the testing. Valley Center was then paid by the patient's insurance for the testing. Valley Center then paid money it received from insurance to QBR.

16.    QBR paid marketers, including **ROBSON**, to recruit referring physicians to order QBR's NCV and SEP testing. **ROBSON** received a fee for each patient referred for testing by providers **ROBSON** was associated with once the test was reimbursed by insurance.

4

17.    Federal health care programs were billed millions of dollars for electro-diagnostic testing ordered from QBR by doctors who were paid kickbacks for their orders.

### PRESCRIPTION DRUGS

18.    **ROBSON** marketed prescription drugs for certain specialty pharmacies.

19.    Those pharmacies billed insurers for specialty drug prescriptions issued by providers with whom **ROBSON** was associated.

20.    Those specialty drug prescriptions included compounded drugs. In general, "compounding" was a practice in which a licensed pharmacist or physician combined, mixed, or altered ingredients of a drug or multiple drugs to create a medication tailored, at least purportedly, to the needs of an individual patient. Compounded drugs were not approved by the U.S. Food and Drug Administration (FDA). The FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs. As an exception to the FDA approval requirement, compounded drugs could be prescribed by a physician when an FDA-approved drug did not meet the health needs of a particular patient. For example, if a patient was allergic to a specific ingredient in an FDA-approved medication, such as a dye or a preservative, a compounded drug could be prepared excluding the substance that triggered an allergic reaction. Compounded drugs could also be prescribed when a

5

patient could not consume a medication by traditional means, such as an elderly patient or child who could not swallow an FDA-approved pill and needed the drug in liquid form that was not otherwise available.

21.    When billing for drugs dispensed, the pharmacies typically billed a health insurance plan through third-party administrators, such as pharmacy benefit managers (PBMs). These PBMs were "health care benefit programs," as defined in 18 U.S.C. § 24(b), and "federal health care programs," as defined in 42 U.S.C. § 1320a-7b(f). By contracting with PBMs, directly or indirectly, providers agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws, and all applicable prohibitions against fraud, waste, and abuse.

22.    **ROBSON** marketed specialty drugs, including compounded drugs, for Watson Rx to providers including Etowah Pain and Practice 2. **ROBSON** was paid a fee based on the insurance reimbursements for prescriptions issued by those providers.

23.    Federal health care programs paid millions of dollars for medically unnecessary prescriptions for which **ROBSON**, Ray, and Bowman received commissions.

<u>DURABLE MEDICAL EQUIPMENT</u>

24.    **ROBSON** marketed DME for certain suppliers.

25.    Those suppliers billed insurers for DME ordered by providers with whom **ROBSON** was associated.

26.    Health care benefit programs, including Federal health care programs, provided coverage for certain DME, such as ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces.

27.    A claim for DME submitted to health care benefit programs qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury and ordered by a licensed medical provider.

28.    For certain DME products, Medicare promulgated additional requirements that a DME order must meet for an order to be considered "reasonable and necessary." For example, for off-the-shelf knee braces billed to Medicare under the Healthcare Common Procedures Coding System Codes L1833, an order would be deemed "not reasonable and necessary," and reimbursement would be denied, unless the ordering or referring physician documented the beneficiary's knee instability using an objective description of joint laxity determined through a physical examination of the beneficiary.

29.    **ROBSON** marketed DME to providers including Etowah Pain and Practice 2. **ROBSON** was paid a fee for DME ordered by those providers, including Etowah Pain and Practice 2, based on the amount paid for by insurance.

30.     Federal health care programs paid at least hundreds of thousands of dollars for medically unnecessary DME for which **ROBSON**, Ray, and Bowman received commissions.

### BILLING FOR MEDICAL SERVICES

31.     Various public and private entities offer health insurance plans to cover medical care, pharmaceuticals, DME, diagnostic tests, and other services provided to individuals covered by those plans, who are often referred to as "beneficiaries" or "members."

32.     The Medicare program is a federal health care benefit program providing benefits to persons over the age of 65 or disabled. Medicare is administered by the United States Department of Health and Human Services through its agency, the Centers for Medicare and Medicaid Services.

33.     Blue Cross Blue Shield of Alabama (Blue Cross) is a private health insurance company that provides medical insurance in Alabama and elsewhere.

34.     Medicare and Blue Cross make insurance payments directly to a provider of medical services or goods, rather than to a beneficiary. This payment occurs after the provider submits the claim to the health care benefit program for payment, either directly or through a billing company. By enrolling in Medicare or Blue Cross, and then submitting a claim for payment, a health care provider is

certifying that services or goods being provided to a patient are provided in accordance with the requirements of the insurer.

35.    Medicare and Blue Cross will pay a medical provider only for medical services or goods that are medically necessary for the treatment of the patient being provided the services or goods.

36.    In addition, Medicare and Blue Cross will not pay for medical services or goods that were provided in violation of the federal Anti-Kickback Statute.

37.    Medicare and Blue Cross require providers to collect co-pays, typically a fixed amount, from patients, in part so that the patient is financially motivated to decline medically unnecessary or otherwise fraudulent services or goods.

38.    Medicare is a "federal health care program," as defined in 42 U.S.C. § 1320a-7b(f). Medicare and Blue Cross are "health care benefit programs," as defined in 18 U.S.C. § 24(b).

## <u>COUNT ONE</u>
Conspiracy to Pay and Receive Kickbacks
[18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(1) and (2))]

39.    The allegations in Paragraphs 1 through 38 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

40.     From at least in or about 2014 and continuing through in or about 2018, within Jefferson County in the Northern District of Alabama and elsewhere, defendant

## JOHN ALAN ROBSON

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others known and unknown to the United States:

a.     to knowingly and willfully offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to: (A) any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under Federal health care programs, including Medicare; and (B) purchase, lease, order, and arrange for and recommend purchasing, leasing and ordering any good, facility, service and item for which payment may be made in whole and in part under Federal health care programs, including Medicare, in violation of 42 U.S.C. § 1320a-7b(b)(2); and

b.     to knowingly and willfully solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for: (A) referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under Federal health care programs, including Medicare; and (B) purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing and ordering any good, facility, service and item for which payment may be made in whole and in part under Federal health care programs, including Medicare, in violation of 42 U.S.C. § 1320a-7b(b)(1).

## Purpose of the Conspiracy

41.    It was the purpose of the conspiracy for defendant **ROBSON** and his co-conspirators to unlawfully enrich and benefit themselves by: (1) offering, paying, soliciting, and receiving kickbacks and bribes to ensure that orders for electro-diagnostic testing for Medicare and other Federal health care program beneficiaries would be referred to and performed by QBR; (2) offering, paying, soliciting, and receiving kickbacks and bribes to ensure that specialty drug prescriptions for Medicare and other Federal health care program beneficiaries would be issued; (3) offering, paying, soliciting, and receiving kickbacks and bribes to ensure that DME orders for Medicare and other Federal health care program beneficiaries would be issued; (4) submitting and causing to be submitted claims to Medicare and other Federal health care programs for these items and services based on these referrals; (5) concealing and disguising the payment, receipt, and transfer of illegal kickbacks and the proceeds of the fraud; and (6) using proceeds of the scheme for their personal use and benefit and the use and benefit of others.

## Manner and Means

42.    The manner and means by which defendant **ROBSON** and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

43.     It was a part of the conspiracy that Hornbuckle offered and paid medical providers in exchange for and for the purpose of inducing referrals for medically unnecessary electro-diagnostic testing. For example, Hornbuckle caused QBR to pay Etowah Pain and Practice 2 a flat fee for each patient those practices referred to QBR for testing once that testing was reimbursed by insurers, including by Federal health care programs. These payments were disguised as hourly payments for the ordering physician's time and the time of the ordering physician's staff, but in fact the ordering provider was paid on a per-patient basis and irrespective of the time the ordering physician or the ordering physician's staff spent on testing-related tasks.

44.     It was a part of the conspiracy that medical providers solicited and received kickbacks in the form of direct and indirect remuneration in exchange for and for the purpose of inducing the referrals of patients for medically unnecessary electro-diagnostic testing by QBR.

45.     It was a part of the conspiracy that **ROBSON** marketed this arrangement to providers, including Etowah Pain and Practice 2.

46.     It was a part of the conspiracy that Hornbuckle paid **ROBSON** a flat fee for each patient that Etowah Pain and Practice 2 referred to QBR for testing once that testing was reimbursed by insurers, including by Federal health care programs.

47.     It was a part of the conspiracy that Watson Rx paid **ROBSON** fees for the specialty drug prescriptions that were issued by Etowah Pain and Practice 2, sent

to Watson Rx, and reimbursed by insurance, including Federal health care programs.

48.     It was a part of the conspiracy **ROBSON** or coconspirators paid other coconspirators kickbacks in order to induce the referral of specialty drug prescriptions to Watson Rx and other pharmacies that would be billed to and paid by Federal health care programs.

49.     It was a part of the conspiracy that a DME supplier paid **ROBSON** fees for DME ordered by Etowah Pain and Practice 2, sent to the DME supplier, and reimbursed by insurance, including Federal health care programs.

50.     It was a part of the conspiracy **ROBSON** or coconspirators paid other coconspirators kickbacks in order to induce the referral of DME orders to the DME supplier that would be billed to and paid by Federal health care programs.

### Overt Acts

51.     In furtherance of the conspiracy and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the Northern District of Alabama and elsewhere, at least one of the following overt acts, among others:

52.     On or about January 18, 2017, OrthoPlus, LLC, paid an $11,693.03 kickback to **ROBSON** for specialty prescriptions and other ancillary services issued and ordered by providers associated with **ROBSON**.

53.     On or about October 11, 2017, QBR paid a $6,959.99 kickback to **ROBSON** for electro-diagnostic testing performed by QBR on patients referred by providers associated with **ROBSON**.

54.     On or about January 4, 2018, Watson Rx paid **ROBSON** a $5,965 kickback for prescriptions issued by providers with whom **ROBSON** was associated that had been reimbursed by insurance.

55.     On or about January 11, 2018, QBR paid a $2,040.94 kickback to **ROBSON** for electro-diagnostic testing performed by QBR on patients referred by providers associated with **ROBSON**.

56.     On or about January 17, 2018, OrthoPlus, LLC, paid a $1,296.32 kickback to **ROBSON** for specialty prescriptions and other ancillary services issued and ordered by providers associated with **ROBSON**.

57.     On or about February 14, 2018, Watson Rx paid **ROBSON** a $4,572 kickback for prescriptions issued by providers with whom **ROBSON** was associated that had been reimbursed by insurance.

All in violation of 18 U.S.C. § 371.

## COUNTS TWO THROUGH FOUR
[42 U.S.C. § 1320a-7b(b)(1) and 18 U.S.C. § 2]

58.    The factual allegations in Paragraphs 1 through 57 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

59.    On or about the dates set forth below, with respect to each count, in the Northern District of Alabama and elsewhere, the defendant, **JOHN ALAN ROBSON**, did knowingly and willfully solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, as set forth below, in return for: (A) referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under Federal health care programs; and (B) arranging for and recommending the order of any good, facility, service and item for which payment may be made in whole and in part under Federal health care programs, in violation of 42 U.S.C. § 1320a-7b(b)(1).

60.    The allegations of Paragraphs 58 and 59 of this Indictment are re-alleged for each of Counts 2 through 4 as though fully set forth therein.

| COUNT | APPROX. AMOUNT | DESCRIPTION |
|-------|----------------|-------------|
| 2 | $2,040.94 | Deposit from QBR, LLC, to **ROBSON** bank account ending in x180, dated January 11, 2018 |
| 3 | $5,965 | Check number 5559, drawn on Watson Rx account, payable to **ROBSON**, dated January 4, 2018 |
| 4 | $4,572 | Check number 5644, drawn on Watson Rx account, payable to **ROBSON**, dated February 14, 2018 |

All in violation of 42 U.S.C. § 1320a-7b(b)(1) and 18 U.S.C. § 2.

### COUNT FIVE
Conspiracy to Commit Health Care Fraud
[18 U.S.C. § 1349 (18 U.S.C. § 1347)]

61.    The allegations in Paragraphs 1 through 60 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

62.    From at least in or about 2014 and continuing through in or about 2018, within Jefferson County in the Northern District of Alabama and elsewhere, defendant

### JOHN ALAN ROBSON

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others known and unknown to the United States to execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in 18 U.S.C. § 24(b), that is, Medicare, Blue Cross, and others, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, those health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, in violation of 18 U.S.C. § 1347.

16

## Purpose of the Conspiracy

63.    It was the purpose of the conspiracy for defendant **ROBSON** and his co-conspirators to unlawfully enrich and benefit themselves by: (1) offering, paying, soliciting, and receiving kickbacks and bribes to ensure that orders for electro-diagnostic testing for Medicare and other Federal health care program beneficiaries would be referred to and performed by QBR without regard to medical need; (2) offering, paying, soliciting, and receiving kickbacks and bribes to ensure that specialty drug prescriptions for Medicare and other Federal health care program beneficiaries would be issued without regard to medical need; (3) offering, paying, soliciting, and receiving kickbacks and bribes to ensure that DME orders for Medicare and other Federal health care program beneficiaries would be issued without regard to medical need; (4) submitting and causing to be submitted claims to Medicare and other Federal health care programs for these items and services based on these referrals; (5) concealing and disguising the manner and proceeds of the fraud; and (6) using proceeds of the scheme for their personal use and benefit and the use and benefit of others.

## Manner and Means

64.    The manner and means by which defendant **ROBSON** and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

17

65.    It was a part of the conspiracy that Hornbuckle offered and paid medical providers in exchange for and for the purpose of inducing referrals for medically unnecessary electro-diagnostic testing. For example, Hornbuckle caused QBR to pay Etowah Pain and Practice 2 a flat fee for each patient those practices referred to QBR for testing once that testing was reimbursed by insurers, including by Federal health care programs.

66.    It was a part of the conspiracy that medical providers solicited and received kickbacks in the form of direct and indirect remuneration in exchange for and for the purpose of inducing the referrals of patients for medically unnecessary electro-diagnostic testing by QBR.

67.    It was a part of the conspiracy that **ROBSON** marketed this arrangement to providers, including Etowah Pain and Practice 2.

68.    It was a part of the conspiracy that Hornbuckle paid **ROBSON** a flat fee for each patient that Etowah Pain and Practice 2 referred to QBR for testing once that testing was reimbursed by insurers, including by Federal health care programs.

69.    It was a part of the conspiracy that **ROBSON** and his coconspirators worked to increase the number of tests referred to QBR and performed on patients without regard to whether those patients had a true medical need for the tests.

70.    It was a part of the conspiracy that **ROBSON** and his coconspirators worked to increase the number of tests referred to QBR and performed on patients

even though the tests could be uncomfortable or painful, and even though some patients complained about their being asked to undergo the tests.

71.     It was a part of the conspiracy that Watson Rx paid **ROBSON** fees for the specialty drug prescriptions that were issued by Etowah Pain and Practice 2, sent to Watson Rx, and reimbursed by insurance, including Federal health care programs.

72.     It was a part of the conspiracy that a DME supplier paid **ROBSON** fees for DME ordered by Etowah Pain and Practice 2, sent to the DME supplier, and reimbursed by insurance, including Federal health care programs.

73.     It was a part of the conspiracy that **ROBSON** and other marketers obtained prescriptions for themselves or their family members that were billed to insurance without regard to whether those prescriptions were medically necessary for particular patients' particular medical needs.

74.     It was a part of the conspiracy that **ROBSON** and other marketers obtained blank pre-signed prescriptions from medical providers.

75.     It was a part of the conspiracy that **ROBSON** and other marketers caused blank pre-signed prescriptions from providers to be completed for the purpose of assuring that the prescriptions would be paid for by insurance, without regard to whether those prescriptions were medically necessary for particular patients' particular medical needs.

76.    It was a part of the conspiracy that **ROBSON** and other marketers selected particular drugs or drug formulations on prescription forms for the purpose of assuring that insurance would pay for the prescriptions, without regard to whether those prescriptions were medically necessary for particular patients' particular medical needs.

77.    It was a part of the conspiracy that **ROBSON** and other marketers would assure patients and providers that QBR, Watson Rx Solutions, and the DME supplier would not insist on collecting copayments from patients for electro-diagnostic testing, specialty prescriptions, or DME ordered.

All in violation of 18 U.S.C. §§ 1349 and 1347.

## **FIRST NOTICE OF FORFEITURE**
## **18 U.S.C. § 982(a)(7)**

1.    The allegations in COUNTS 1 through 5 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(7).

2.    Upon conviction of the offenses set forth in COUNTS 1 through 5 of this Indictment, the defendant, **JOHN ALAN ROBSON**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

3.     The property to be forfeited includes, but is not limited to, a forfeiture money judgment in United States currency, representing the amount of proceeds obtained, controlled, and benefited from as a result of the offenses alleged.

4.     If any of the property described above, as a result of any act or omission of the defendant:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461(c).

A TRUE BILL

*/s/Electronic Signature*

_____
FOREPERSON OF THE GRAND JURY

PRIM F. ESCALONA
United States Attorney

*/s/Electronic Signature*

_____
JOHN B. WARD
Assistant United States Attorney

*/s/Electronic Signature*

_____
DON B. LONG III
Assistant United States Attorney